594 A.2d 1208

**Arthur Rinald MILES**

v.

**STATE of Maryland.**

**No. 1660, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

Sept. 6, 1991.

jurisdiction, as with the remand that court's jurisdiction is reestablished.

David M. Simpson (John R. Gober, on the brief), Greenbelt, for appellant.

John J. McCarthy, Sp. Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Alexander Williams, Jr., State's Atty. for Prince George's County, Upper Marlboro, on the brief), for appellee.

Argued before MOYLAN, BLOOM and DAVIS, JJ.

BLOOM, Judge.

A jury in the Circuit Court for Prince George's County (Levin, J.) convicted appellant, Arthur Rinald Miles, of all counts in a five count indictment: Count I, murder in the

first degree (felony murder); Count II, use of a handgun in the commission of a felony; Count III, attempted robbery with a dangerous and deadly weapon; Count IV, use of a handgun in a crime of violence; and Count V, conspiracy to commit robbery with a dangerous and deadly weapon.

The court sentenced appellant to life in prison on Count I, 20 years on Count II to be served consecutively with the sentence imposed on Count I, and 20 years on Count V to be served concurrently with the sentences imposed on Counts I and II.[1]

In this appeal from those judgments, appellant presents the following assertions of error:

I. The trial court erred in not granting appellant's motion to recuse.

II. The trial court erred in conducting an in-chambers conference, in appellant's absence, concerning the disqualification of a juror.

III. The trial court erred in not excusing Mrs. Oates, the juror referred to in the above mentioned argument.

IV. The trial court erred in its conduct of the *voir dire.*

V. Appellant's arrest was illegal and the trial court erred in failing to suppress his subsequent confession and the search of his house.

VI. The trial court erred in failing to control the scope of the State's opening statement.

VII. The trial court erred in dismissing appellant's motion for reverse waiver.

Perceiving no reversible error, we shall affirm the judgments of the circuit court.

## Facts

On 7 April 1990, Carl Anthony Krogmann was shot and killed by a .22 caliber pistol while attempting to deliver a "Domino's" pizza at 11007 Mount Lubentia Way in the

---

1. Count III merged with Count I as it was the underlying felony, Count II and Count IV merged for sentencing purposes.

Largo area of Prince George's County, Maryland. On 9 April 1990, appellant and Roland H. Jeter were arrested pursuant to an arrest warrant, issued by a District Court Commissioner, charging them with murder.[2]

While in custody, appellant gave a full statement incriminating himself and Jeter, the result of which was the issuance of a search warrant for appellant's premises. The subsequent seizure included a gun and other items of evidence.

Following appellant's arrest, a District Court Commissioner set bond for him. Prior to trial, the circuit court, at the State's request, overruled the decision of the Commissioner, revoked the bond, and ordered that appellant not be released on bond pre-trial. That ruling led to a petition for writ of *habeas corpus*, which was denied. Appellant then filed an application for leave to appeal to this Court. On 14 August 1990, in an unreported *per curiam* decision, this Court reversed the trial court and reinstated bond.

Motions for reverse waiver and to suppress appellant's oral and written statements and items that had been seized as a result of those statements were denied. Appellant's motion for recusal of the trial judge was heard on 30 August 1990, and denied. That motion was renewed at the commencement of the trial and again denied.

Since the basic facts are not in dispute, a detailed rendition is unnecessary at this time. We shall, however, set forth those facts pertinent to each of appellant's arguments as they appear in our discussion below.

## I.

In his first argument, appellant asserts that the trial judge should have granted his recusal motion based on the "intense" pre-trial publicity surrounding this case. Appellant specifically contends that the trial judge was biased and prejudiced against him due to that publicity.

---

**2.** Appellant and Jeter were tried separately.

Basing his request for disqualification on the appearance
of impropriety, appellant offered as evidence exhibits dem-
onstrating the pre-trial publicity as well as this Court's *per
curiam*, unreported opinion in which we reversed the trial
judge's decision to revoke bond and concluded that "the
revocation of bail may have been, in part, a response to
public opinion."

■ We note at the outset that "in the absence of a
constitutional or statutory provision to the contrary, the
judge who presided at the trial of a case which is reversed
on appeal and remanded for a new trial is not disqualified to
retry the case." *Bd. of Medical Examiners v. Steward*,
203 Md. 574, 583, 102 A.2d 248 (1954).

■ The trial judge in the case at bar was certainly not
disqualified because his decision to revoke bond was re-
versed by this Court. According to our opinion, the only
fact upon which the judge based his decision to revoke bond
was the grand jury indictment and this was not a sufficient
change of circumstances to justify the revocation of appel-
lant's bond.

Likewise, we find it inappropriate to base disqualification
on the fact that, in dicta, we took judicial notice of the pre-
trial publicity. It would have been impossible for this Court
to have ignored the amount of pre-trial publicity garnered
by this case; even so, we took great pains to minimize and
qualify its impact on the trial court's decision by using the
words *"may have been, in part,* a response to public
opinion."

Appellant's reliance on *Boyd v. State*, 321 Md. 69, 581
A.2d 1 (1990), for the proposition that the court should have
addressed the appearance of impropriety—and its failure to
do so was plain error—is a misapplication of the standard
involved in such a ruling.[3] According to the Court in *Boyd:*

---

3. In *Boyd, supra,* the question was whether the trial judge erred in
refusing to recuse himself, but the circumstances under which error
was alleged were quite different from the case *sub judice.* Unlike the

There may be, and doubtless are, many circumstances in which a delicate sense of propriety would, and probably should, induce a judge to decline to sit in a given case and, upon his own motion or upon motion of either of the parties, remove the cause to another jurisdiction or request some other judge of the same jurisdiction to preside at trial. However, if the presiding judge, under such circumstances, refuses to do this, he is within his legal rights; and his action in that respect is not the subject of review. Where the alleged disqualification does not amount to a constitutional or legal disqualification, the question is left to the enlightened conscience, delicacy of feeling, and sense of fairness possessed by the individual judge. The long and honorable history of the judiciary of this state impels the belief that the decision of such questions can be safely left where the responsibility now reposes. Judges are selected to be useful public servants, and no judge's view of the proprieties in such questions should be carried to such an extent as would result in the serious curtailment of his usefulness as a public officer. (Citations omitted.)

*Id.* at 74–75, 581 A.2d 1.

In response to appellant's motion for recusal, the trial court stated:

I have read what you have written and I listened carefully to what you have said, and I have been here sixteen years and I have presided over hundreds of cases in the past sixteen years, both civil and criminal, and the last thing that I tell jurors in this case, in any case, is that it is my function to rule on the evidence and to see that everybody has a fair trial. I intend to do that in this case, and accordingly, your motion [to recuse] is denied.

The blunt fact of the matter is that whatever may have influenced the trial judge's decision with respect to revoca-

---

instant case, the Court in *Boyd* was concerned with information acquired by the trial judge as a result of the prior judicial proceedings involving codefendants.

tion of appellant's bond has absolutely nothing to do with his role in a jury trial. There is simply no indication in the record that the judge was unable to conduct his judicial duties as an impartial arbiter of the law.

■ Appellant further argues that the court should have allowed another judge to determine whether recusal was necessitated. The State contends that this issue was not raised before the trial court and should be deemed waived. We note that appellant filed an affidavit asserting his belief that the court was biased and prejudiced against him. That is sufficient to preserve the recusal issue; it is not necessary that a party specifically request that the recusal motion be heard by another judge if the allegations of the recusal motion are such that another judge should rule on the motion.

In *Surratt v. Prince George's County,* 320 Md. 439, 465, 578 A.2d 745 (1990), the Court of Appeals recognized that it is a statutory requirement in the federal system that "whenever a party to any proceeding ... makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, ... such judge shall proceed no further therein, but another judge shall be assigned ... to hear such proceeding." 28 U.S.C. § 144.

Noting that Maryland had no statute or rule similar to 28 U.S.C. § 144, the Court observed:

[T]he recusal motion must set forth facts in reasonable detail sufficient to show the purported personal misconduct; mere conclusions as to lack of impartiality will not suffice. And it should be supported by affidavit or testimony or both.

These requirements are similar to the federal requirement that an affidavit be filed which "state[s] the facts and the reasons for the belief that bias or prejudice exists."

*Id.* at 467, 578 A.2d 745. We hold that appellant's filing of such an affidavit sufficiently preserved this issue for our review.

In *Surratt, supra,* 320 Md. at 466, 578 A.2d 745, the Court of Appeals held that

> when the asserted basis for recusal is personal conduct of the trial judge that generates serious issues about his or her personal misconduct, then the trial judge must permit another judge to decide the motion for recusal.

██ In the case *sub judice,* appellant's affidavit simply stated that he believed the trial court was biased and prejudiced against him due to (1) the pre-trial publicity, (2) the revocation of bond in the first instance, and (3) this Court's judicial notice of the publicity and conclusion that the court may have been influenced by it.

There is in this case no allegation of personal misconduct such as was made in *Surratt.* Appellant's reliance on *Surratt,* therefore, is misplaced. In *Surratt,* a female attorney, in requesting the trial judge to recuse himself, set forth detailed assertions of misconduct on the part of the trial judge toward her personally, such as phone calls, invitations to chambers late in the day, comments on her personal appearance, and questions pertaining to her personal relationships.

In the instant case, appellant's reasons for recusal are based solely on his own beliefs that the trial judge showed bias against him by revoking his bond. This is simply not the type of situation envisioned by *Surratt* that would require a second judge to decide the issue of recusal.

We perceive no error in the denial of the recusal motion.

## II.

Appellant's next argument concerns an in-chambers conference held on the second day of trial. At that conference a juror, Mrs. Oates, revealed that she was a school teacher and had had a parent-teacher conference with a police officer who would be testifying on behalf of the State.

That morning, prior to entering the courtroom, the juror had exchanged greetings with the officer and, when the juror walked away, she felt that this was "not cool." She informed the Jury Commissioner, who then informed the trial court. Mrs. Oates was questioned by the court with both counsel present.

Appellant contends that he should have been present during this in-chambers conference. He asserts that his absence was due to a ruling made by the court on the preceding day wherein the court determined that appellant's presence at an ongoing bench conference was not required by law.

The right of the accused to be present at every stage of his trial is a common law right preserved by Article 5 of the Maryland Declaration of Rights and restated in Maryland Rule 4–231, Presence of Defendant. The State concedes, and the Court agrees, that the determination of whether a juror should be excused for bias, following the initial impaneling of the jury, is a stage of the trial at which the defendant would normally be entitled to be present. *See Bunch v. State,* 281 Md. 680, 686–88, 381 A.2d 1142 (1978).

The State argues, however, that this right was waived when appellant "failed to affirmatively ask to be present at bench conferences or does not express an objection at the time, and if his attorney consents to his absence or says nothing regarding the matter."

In *Bunch, supra,* the Court held that the defendant had a right to be present personally during the proceedings concerning the possible disqualification of a juror for bias. The Court further stated that "this right cannot be waived by counsel." *Id.* at 688, 381 A.2d 1142.

In *Williams v. State,* 292 Md. 201, 438 A.2d 1301 (1981), however, the Court prospectively applied a modification of the common law principle that the right to be present at every stage of the trial can never be waived by counsel's action or inaction. According to the Court:

The right of the defendant to be present at bench conferences involving examination of jurors or prospective jurors, or during communications on a point of law between the court and jury, or during certain other stages of the trial, is no more "fundamental" than many other "rights" which can be waived by counsel's action or inaction.

\* \* \* \* \* \*

With respect to all criminal trials, or parts of trials, taking place after the issuance of our mandate in this case, an effective waiver of the defendant's right to be present at every stage of the trial will not always require a personal waiver by the defendant. Where the right of confrontation is not implicated, and where there is involved no other right requiring intelligent and knowing action by the defendant himself for an effective waiver, a defendant will ordinarily be bound by the action or inaction of his attorney.

*Id.* at 218–19, 438 A.2d 1301.

Our review of the record indicates that there was no discussion before or during the conference pertaining to appellant's absence. Appellant asserts that "counsel did not waive the presence of the Defendant at this stage (or any stage) of the trial." Appellant further contends that "the Court ruled he was only entitled to be present at *voir dire.*"

Appellant's reliance on the court's determination at a bench conference on the preceding day is inapposite. On the preceding day there had been a bench conference concerning *voir dire* of the jury. Appellant was present at that conference. Subsequently, during the trial, an issue arose concerning admissibility of evidence, and the court called counsel to the bench. As appellant approached the bench in the company of his counsel, the court directed him to return to his seat. The following colloquy ensued:

COUNSEL: ... my client wishes to be present at every bench conference ...

THE COURT: My position is as I understand the law to be. He's only allowed to be up here during the *voir dire.*

COUNSEL: Your Honor, my understanding is he's allowed to be at integral parts of the trial.

THE COURT: Fine. All right. Now, let's go.

There is no indication that the trial court's ruling applied to anything other than the particular subject matter with which this conference was concerned, namely, the introduction of evidence. To apply the court's explanation of his understanding of the law on one day to a conference that took place the next day, on a different subject matter, would ultimately relieve counsel of any obligation to investigate that point of law in the interim in order to determine whether appellant should be present at any subsequent conferences.

■ It is clear that appellant had a right to be present at the in-chambers conference. It is also clear that appellant's failure to object, either personally or through counsel, constituted a waiver of that right, precluding this Court from deciding an issue that was neither raised in nor decided by the trial court.

### III.

Appellant next contends that the trial court erred in not excusing the juror, Mrs. Oates, who had come forward and revealed that she was acquainted with a police officer who was one of the State's witnesses.

Mrs. Oates, during the proceedings *in camera*, indicated to the trial judge that before entering court that morning she recognized a man seated outside the courtroom as the father of a former student. They merely exchanged a simple greeting and she walked on. She then remembered that her former student's father was a police officer. The subsequent in-chambers conference formed the basis of appellant's second assertion, discussed *supra.*

The juror further informed the court that she had listened attentively to all the names previously read by the judge and had not recognized this witness's name. The following conversation then ensued:

THE COURT: Would the fact that this former student of yours father is going to testify in this case, would that prejudice you in some way?

JUROR: Uh uh.

THE COURT: All right.

JUROR: No. I have not talked to him other than seeing him at school since I had a conference with him.

THE COURT: You have not discussed this case with him or anything?

JUROR: I didn't even know he was on it.

After Mrs. Oates left the judge's chambers, appellant moved that she be removed from the jury and replaced by one of the two alternates. The motion was denied. Upon reentering the courtroom, appellant renewed his motion and pointed out to the court that he had used only five peremptory strikes and that he "would have struck any person who had personal knowledge of a witness in this case, let alone a police officer.

Appellant correctly points out that the decision to excuse a juror and to seek an alternate in his or her place is within the sound discretion of the trial court. *Tisdale v. State*, 41 Md.App. 149, 396 A.2d 289 (1979). Appellant argues, however, that the court's error was in denying him his right to a peremptory challenge. Appellant further contends that this constituted reversible error even without a showing of prejudice.

■ Maryland Rule 4–313(b)(3), governing peremptory challenges in criminal trials, states:

After the required number of jurors has been called, a party may exercise any remaining peremptory challenges to which the party is entitled at any time before the jury is sworn, except that no challenge to the first 12 jurors shall be permitted after the first alternate juror is called.

Mrs. Oates was one of the original twelve jurors selected. After appellant announced that he was satisfied with the initial twelve sitting jurors, two alternates were selected. Barbara Ford had been called and seated as the first alternate the day before. Resurrection of appellant's peremptory challenges was clearly prohibited by the rules.

Appellant then argues that the trial court "abused its discretion in refusing to strike Mrs. Oates, since with two alternates available, there was no reason *not* to strike her." Appellant misapplies the standard under which a juror may be struck for cause.

We note at the outset that appellant's objection to Mrs. Oates was made timely. In *Bristow v. State*, 242 Md. 283, 219 A.2d 33 (1966), a juror did not know until after the commencement of the trial that his son was to be a witness for the State. In that case, appellant did not know and reasonably could not have known of the father-son relationship until the witness was called to testify. According to the Court:

> A challenge to an individual juror for cause must be made before that juror is sworn or at least before any evidence is received. Maryland rule 744 d. Where a cause for challenge was not reasonably known to the defendant until after commencement of the trial, as was the situation in this case, it was still not too late to object to a juror's qualifications.

*Id.* at 287, 219 A.2d 33.

According to Maryland Rule 4-312(e):

> A party may challenge an individual juror for cause. A challenge for cause shall be made and determined before the jury is sworn, or thereafter for *good cause shown.* (Emphasis added.)

The fact that Mrs. Oates was acquainted with Detective Evans could not have been reasonably known to appellant prior to the commencement of the trial. Appellant has therefore satisfied the standard enumerated in 4-312(e) for

challenging an individual juror after the jury has been sworn.

We have pointed out before that "[a] juror may be struck for cause only where he or she displays a predisposition against innocence or guilt because of some bias extrinsic to the evidence to be presented." *McCree v. State,* 33 Md. App. 82, 98, 363 A.2d 647 (1976). (Citations omitted.)

Appellant's reliance on both *Chew v. State,* 71 Md.App. 681, 527 A.2d 332 (1987), *vacated,* 317 Md. 233, 562 A.2d 1270 (1989), and *Stokes v. State,* 72 Md.App. 673, 532 A.2d 189 (1987), is inapposite. In *Chew, supra,* 71 Md.App. at 705, 527 A.2d 332, Judge Moylan, writing on behalf of this Court, described the strategy behind the jury selection process as follows:

> Generally speaking, the issue is not that of good jurors versus bad jurors or adequate jurors versus inadequate jurors. It is rather the wily maneuvering of two skilled chess players to obtain a slight edge, a barely discernible "tilt" as they mold a jury.

In *Stokes v. State,* 72 Md.App. 673, 683, 532 A.2d 189 (1987), this Court found an abuse of discretion and reversible error in the removal of a juror, stating:

> If, then, the judge replaces a juror who appears to be favorably disposed toward the defendant (in this case, the juror who smiled at him) with an alternate who does not appear to be as favorably disposed to his cause, the defendant has been injured. Even though the jury remains composed of competent and qualified jurors, the judge has remolded it with a new "tilt."

In the case *sub judice,* appellant does not argue that the judge remolded the jury with a new "tilt," but that "the jury was inadvertently slightly tilted prior to the trial." And, that when this fact was discovered, "the Trial Judge refused to re-level the playing field despite the presence of two alternates."

In *Stokes, supra,* 72 Md.App. at 683–84, 532 A.2d 189, we concluded that "in removing juror number eleven over the

defendant's objection without establishing on the record good cause for such extraordinary action, the trial judge abused his discretion to the prejudice of the defendant...."

In the case at bar we are faced with a different set of facts. Here, appellant objected to Mrs. Oates and attempted to use his remaining peremptory challenges to remove her from the jury. At this stage of the trial, however, according to Rule 4–312(e), removal of Mrs. Oates had to be for cause. Appellant failed to show the trial court that the presence of Mrs. Oates on the jury denied him his right to a fair trial and impartial jury.

In *Couser v. State,* 282 Md. 125, 138, 383 A.2d 389, *cert. denied,* 439 U.S. 852, 99 S.Ct. 158, 58 L.Ed.2d 156 (1978), the Court stated that:

> [T]he due process clause of the fourteenth amendment and Article 21 of the Maryland Declaration of Rights guarantee the right to an impartial jury to an accused in a criminal case; these constitutional guarantees do not, however, insure that a prospective juror will be free of all preconceived notions relating to guilt or innocence, only that he can lay aside his impressions or opinions and render a verdict based solely on the evidence presented in the case.

In the case *sub judice,* the trial court was diligent in its effort to determine whether the presence of Mrs. Oates unfairly prejudiced appellant's right to a fair trial and impartial jury. The conversation, as set forth above, clearly indicates that the juror was simply acquainted with a witness whose eventual testimony proved to be of a limited nature. Detective Evans testified that he prepared and executed the search warrant of appellant's premises. He also testified as to the items of evidence seized. Additionally, the juror answered quite specifically that the fact that she had once had a parent-teacher conference with the witness would in no way prejudice her against appellant.

Appellant failed in any way to show that the presence of Mrs. Oates denied him a fair trial and impartial jury.

## IV.

Appellant next contends that the court erred in its conduct of the *voir dire*, claiming that "in cases of extensive publicity, defense counsel should be accorded more latitude in personally asking or tendering searching questions that might root out indications of bias." In particular, appellant claims the trial court erred when it refused to permit specific questions concerning appellant's alleged confession as well as the fact that appellant's bail had been previously revoked, although reinstated at a later date.

Appellant further asserts that when certain questions he submitted were asked and affirmative responses received, the court erred by failing to make further inquiry concerning prejudice.

The State argues that appellant's acceptance of the jury constituted a waiver of any antecedent complaint. We disagree and shall briefly address this point. In *Tisdale v. State*, 30 Md.App. 334, 353 A.2d 653 (1976), we found that counsel's response that the jury ultimately selected was acceptable was merely obedient to the court's ruling and obviously not a withdrawal of the prior objection, timely made.

In the instant case defense counsel stated: "Your Honor, in response to the question am I satisfied with the jury, my client and I are satisfied with the selection process." Although a simple "yes" would have sufficed, and the reference to the "selection process" is somewhat puzzling, there is no basis on which to hold that appellant had thereby withdrawn his prior objections.[4] *See also, Morris v. Wilson*, 74 Md.App. 663, 539 A.2d 1151 (1988), *aff'd*, 317 Md. 284, 563 A.2d 392 (1989) (When an allegation of personal juror bias was disclosed only after the juror was sworn, the

---

**4.** The record reflects that defense counsel reviewed each question submitted and reaffirmed his request that it be asked. Additionally, defense counsel attempted to ask additional questions of certain jurors, before the court, in response to the State's objection, denied him any further questioning.

objection was not waived by virtue of defendant's failure to except prior thereto, and at that point it was incumbent upon the judge to conduct a *voir dire* to determine if that juror could put aside his personal bias and render a fair and impartial verdict).

In the case at bar, the court asked the following question on *voir dire:*

The case that you are about to hear today and in all probability for the next few days involves an incident that occurred in our County back on April the 7th of this year. This incident involves an alleged armed robbery of a man named Carl Krogmann which evidently ended up in Mr. Krogmann being killed. Mr. Krogmann was a deliveryman for Domino's Pizza. And as a result of this or as a result of these allegations the Defendant in this case has been charged the most serious crime of which is murder. Based on the little that I have just told you, has anybody read about this case, heard about it in some way or seen it on television or have it come to their attention in some way?

The court then asked:

Does any member of the prospective panel know of any reason that I haven't asked you about why you could not sit on this case and render a fair and impartial verdict based solely on the evidence that you are going to hear in this courtroom?

Appellant proposed further written *voir dire* questions, to "search out jurors with a fixed opinion." For example, appellant proposed the following two questions, both of which the trial court declined to ask:

32. Has any member of prospective jury panel read or heard that the Defendant allegedly confessed to the alleged homicide?

33. The defendant in this case is currently free on bail (his bail had previously been revoked), this fact has been extensively reported in the news media, (television and newspaper) does the fact that he is free on bail and

previously had his bail revoked effect any prospective juror's ability to fairly consider this matter?

After reviewing the proposed questions at a bench conference, the trial court expanded on a previously asked question, concerning connection with any kind of state, county, or federal law enforcement agency, to include a private law enforcement agency. The court also asked whether there was anyone who had an immediate family member connected with the legal profession, or whether any prospective jury member or his or her family member was ever involved with a business that included delivery of some kind of goods to a private home. Finally, due to the timing of the case, the court inquired whether anyone was a reserve officer in the armed forces.

▆▆ We note at the outset that "[t]he purpose of the *voir dire* examination is to ascertain the existence of cause for disqualification and for no other reason." *Bremer v. State,* 18 Md.App. 291, 321, 307 A.2d 503 (1973), *cert. denied,* 415 U.S. 930, 94 S.Ct. 1440, 39 L.Ed.2d 488 (1974); *see also, Bedford v. State,* 317 Md. 659, 670, 566 A.2d 111 (1989).

Recently, the United States Supreme Court dealt with a case involving extensive pre-trial publicity in which the trial court refused to ask any of the defendant's proposed questions on *voir dire* relating to the content of news items that potential jurors might have read. *Mu'Min v. Virginia,* —— U.S. ——, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991). Pre-trial publicity included articles discussing the details of the murder and the investigation, including "information about petitioner's prior criminal record, the fact that he had been rejected for parole six times, accounts of alleged prison infractions, details about the prior murder for which Mu'Min was serving his sentence at the time of this murder, a comment that the death penalty had not been available when Mu'Min was convicted for this earlier murder, and indications that Mu'Min had confessed to killing Gladys Nopwasky." *Id.,* at ——, 111 S.Ct. at 1901.

The petitioner in that case asserted "that the Fourteenth Amendment require[d] more in the way of *voir dire* with respect to pretrial publicity than [Supreme Court] cases have held that it does with respect to racial or ethnic prejudice." *Id.* at ——, 111 S.Ct. at 1904. In a 5–4 decision, the Court held that "content" questions were not constitutionally required. *Id.*

According to Chief Justice Rehnquist, writing on behalf of the majority:

> Whether a trial court decides to put questions about the content of publicity to a potential juror or not, it must make the same decision at the end of the questioning: is this juror to be believed when he says he has not formed an opinion about the case? Questions about the content of the publicity to which jurors have been exposed might be helpful in assessing whether a juror is impartial. To be constitutionally compelled, however, it is not enough that such questions might be helpful. Rather, the trial court's failure to ask these questions must render the defendant's trial fundamentally unfair. (Citations omitted.)

*Id.*

In a concurring opinion, Justice O'Connor stated:

> The dissent is correct to point out that the trial judge could have done more. He could have decided, in his discretion, to ask each juror to recount what he or she remembered reading about the case. The fact remains, however, that the trial judge himself was familiar with the potentially prejudicial publicity to which the jurors might have been exposed. Hearing individual jurors repeat what the judge already knew might still have been helpful: a particular juror's tone of voice or demeanor might have suggested to the trial judge that the juror had formed an opinion about the case and should therefore be excused. I cannot conclude, however, that "content" questions are so indispensable that it violates the Sixth Amendment for a trial court to evaluate a juror's credibil-

ity instead by reference to the full range of potentially prejudicial information that has been reported.

*Id.* at ——, 111 S.Ct. at 1909.

Maryland case law also makes clear that appellant's right to an impartial jury was not infringed when the court declined to include certain questions in its *voir dire.* In *Cardin v. State,* 73 Md.App. 200, 225, 533 A.2d 928 (1987), *cert. denied,* 488 U.S. 827, 109 S.Ct. 78, 102 L.Ed.2d 55 *reh. denied,* 488 U.S. 935, 109 S.Ct. 331, 102 L.Ed.2d 348 (1988), this Court held that "[t]he specific questions to be asked on *voir dire* lie within the sound discretion of the trial judge." *See also, Jones v. Federal Paper Board Co., Inc.,* 252 Md. 475, 494, 250 A.2d 653 (1969).

 In the case *sub judice,* appellant's proposed questions were more than adequately covered by the trial court's *voir dire.* Question 32, as set forth above, sought to determine whether prospective jury members had been exposed to a specific event: the fact that appellant had allegedly confessed to the crime. The trial court's questions, on the other hand, sought to discover whether venire members had been exposed to *any* events surrounding the case.

During *voir dire,* one prospective juror revealed that he had heard about the case on a talk show and that the subject of appellant's bail subsequently came up at work. According to the juror, the discussion involved the fact that appellant was free on bail while his co-defendant was held over.

Although the juror ultimately satisfied the court as to his impartiality, appellant states that:

this discussion was precisely the subject of Defendant's proposed Voir Dire question No. 33, a question the Trial Judge refused to give. The more searching *voir dire* requested by Appellant might well have revealed more positive responses like [this juror's].

At first blush appellant's proposed question 33 appears to have as its purpose the discovery of prospective jurors who

would be biased in a case where a defendant is free on bail, having previously had his bail revoked. The inclusion of a reference to the media coverage and indeed appellant's own argument in support thereof, however, leads us to a different conclusion.

In reality, the underlying purpose of the question was to determine who had been exposed to the extensive media coverage surrounding the bail revocation and reinstatement hearings. For the same reasons that question 32 was more than adequately covered by the court's *voir dire*, so too was question 33.

Appellant further contends that the court denied him the opportunity to "assist" in questioning prospective jurors.[5] Appellant's argument in support of this assertion of error consists solely of what occurred. We are not given the benefit of any supportive analysis or authority that would "assist" this Court in making a determination.

---

5. In response to the court's inquiry a prospective juror admitted to knowing some of the circumstances surrounding the case. The court then asked whether that knowledge caused the juror to prejudge the case or to form any opinion with respect to guilt or innocence. The juror responded "I don't think so." With that, appellant's counsel noted an objection and requested that she be struck for cause because her response was "I don't think so," instead of "yes." At counsel's request that she be more fully questioned, the court called the prospective juror back and elicited a "yes" response.

In another instance a juror responded "not really" when the court asked whether he had formed any opinion based on what he had read or heard about the case. Counsel then requested permission to question the prospective juror further and asked him in light of his response, "not really," whether he had any doubts about whether he had formed an opinion. The juror answered in the affirmative and was subsequently struck for cause.

In the next, and last, instance where the court permitted appellant's counsel to interject a question, counsel stated to another prospective juror that he thought she had hesitated before answering "yes" to the question of whether she could fairly and impartially decide this case based on the evidence presented. He then asked whether there was any doubt in her mind; to which she responded "no."

In response to the State's objection to this continuing "assistance," the court directed appellant's counsel to refrain from any further questioning to which counsel responded "I just have to protect myself."

██ Appellant further contends that when the court expanded its *voir dire* to include several of his proposed questions, it failed to follow up on affirmative responses. For instance, appellant contends that the court should have made further inquiry concerning prejudice when eight prospective jurors responded affirmatively to the question of whether any member of the panel or their immediate family was connected with the legal profession.

The simple answer is that the court fully complied with appellant's request to ask these particular proposed questions. There is no indication in the record that appellant requested any follow up inquiry to affirmative responses.

A further reading of the record, however, discloses that there was some follow up conversation. Each of those eight prospective jurors stated his or her specific connection with the legal profession. The connections ranged from a relative who was a lawyer to the fact that the prospective juror was a legal assistant.

Despite the fact that counsel failed to apprise the trial court, or for that matter, this Court, of what follow up questions he feels should have been asked, we note that "[t]he questions asked on *voir dire* must go to a specific issue of eligibility; the court may in its discretion refuse to ask those questions which are speculative 'or in the nature of a fishing expedition.' " *Cardin v. State, supra,* 73 Md.App. at 225, 533 A.2d 928 (citations omitted).

Prior to asking appellant's proposed questions, the court had already inquired as to whether any member of the panel knew of any reason that would prevent him or her from rendering a fair and impartial verdict. At this point counsel was in possession of more than adequate information to determine whether bias existed. Any further inquiry would have been in the nature of a "fishing expedition."

The trial court was fully within its discretion in its conduct of *voir dire.* Furthermore, we are persuaded that every effort was made to ensure that each juror was free of

bias. The *voir dire* that was conducted was more than adequate to satisfy constitutional requirements of due process. *Mu'Min v. Virginia, supra.*

## V.

In his next argument, appellant asserts that his arrest was illegal and therefore his confession and the search of his house should have been suppressed as fruits of the original illegality. According to the record, Detective Ricker of the Prince George's County Police obtained a warrant for appellant's arrest from a District Court Commissioner at 4:30 p.m. on 9 August 1990. Following a recitation that the victim had been shot and killed, the affidavit in support of the warrant stated, in pertinent part:

A witness was located during the investigation. The above def. [appellant] is known to the witness. The def. had a conversation with the witness. During the conversation the def. admitted to the witness that he was going to rob the victim and that he had shot the victim.

Detective Ricker testified at the suppression hearing that the witness referred to in the affidavit was Ronald Edwards, that he had spoken with Edwards personally, that Edwards identified appellant by name, that he knew appellant personally and had known him for several years and, finally, that appellant lived in his neighborhood. Detective Ricker further testified that he confirmed that Edwards did in fact live near appellant.

Appellant contends that Detective Ricker's application for the arrest warrant failed to reveal the name of the witness as well as the fact that the witness had a pending drug charge. Additionally, appellant asserts that it contained no corroborative details, thus rendering it facially insufficient.

We are satisfied that, under the totality of the circumstances, there was a substantial basis for the warrant-issuing judge's finding of probable cause.

We note at the outset "that [*Illinois v.*] *Gates* [, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ] instructs us to

read affidavits in a practical, non-technical fashion ..."
*Gipe v. State,* 55 Md.App. 604, 613, 466 A.2d 40 (1983), and,

> after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's *determination of probable cause should be paid great deference by reviewing courts.* (Emphasis in original.)

*Id.* at 612, 466 A.2d 40 (quoting *Illinois v. Gates, supra,* 462 U.S. 213, 236, 103 S.Ct. 2317, 2331).

In *Potts v. State,* 300 Md. 567, 575, 479 A.2d 1335 (1984), the Court stated:

> Under the *Gates* test, ... the police are not required to corroborate every piece of information supplied by the informant. Where, as here, the affidavit taken as a whole creates a fair inference that a particular unsubstantiated assertion is probably correct, probable cause may be found to exist.

In the case *sub judice,* the witness was not anonymous. Edwards called the police station and Detective Ricker picked him up at approximately 4:00 p.m. and proceeded to the Criminal Investigation Division. According to the detective's testimony, Edwards told him that he, Edwards, knew who shot the victim. He also told the detective how he came into possession of this information. At the conclusion of their meeting Edwards produced a written statement containing the same information.

Detective Ricker was immediately able to verify that Edwards did, in fact, live near appellant. At approximately 4:30 p.m., Detective Ricker procured the Commissioner's signature on the arrest warrant.[6]

---

6. Maryland Rule 4–212(d)(1) provides that a Commissioner, as a judicial officer,

> may, and upon request of the State's Attorney shall, issue a warrant for the arrest of the defendant, other than a corporation, upon a finding that there is probable cause to believe that the defendant committed the offense charged in the charging document and [certain other considerations].

In *Quince v. State,* 319 Md. 430, 572 A.2d 1086 (1990), a police officer received a report that there was a man with a gun in the dining hall of a university. According to the Court:

The officer learned that the complaint had been made by the manager of the dining hall. This information carries with it significant indicia of reliability.

The person furnishing the information is identified, and therefore can be held accountable for his actions. As Chief Justice Rehnquist pointed out for the Court in *Adams v. Williams, supra,* 407 U.S. [143] at 146–47, 92 S.Ct. [1921] at 1923 [32 L.Ed.2d 612 (1972)], a person intentionally making a false report to the police may be subject to criminal prosecution.

*Id.* 319 Md. at 434, 572 A.2d 1086.

According to the Court in *State v. Smith,* 305 Md. 489, 516, 505 A.2d 511, *cert. denied,* 476 U.S. 1186, 106 S.Ct. 2925, 91 L.Ed.2d 552 (1986):

The standard for an arrest, namely, probable cause to believe that a suspect has committed a crime, "traditionally has been decided by a magistrate in a nonadversary proceeding on hearsay and written testimony, and the Court has approved these informal modes of proof." (Citations omitted.)

The Court went on to say:

[In *Gerstein v. Pugh,* 420 U.S. 103, 121, 95 S.Ct. 854, 866–67, 43 L.Ed.2d 54 (1975)], [t]he Court found that an informal procedure is justified not only by the lesser consequence of a probable cause determination but also by the nature of the determination itself. It does not require the jurisdiction of conflicting evidence that a reasonable-doubt or even a preponderance standard demands, and credibility determinations are seldom crucial in deciding whether the evidence supports a reasonable belief in guilt.

*Id.* at n. 11.

We hold that the trial court did not err in denying the motion to suppress.

## VI.

Appellant next contends that the trial court, over objection, improperly allowed the prosecutor during opening statement to instruct the jury as to the law. As the prosecutor in the case at bar came to the conclusion of his opening statement, the following exchange took place:

> STATE'S ATTORNEY: At the end of this case, ladies and gentlemen, Judge Levin is going to instruct you among other things on the law of felony murder. I want you to remember this, write it down, remember it, say it to yourself. He will instruct you that an accident—
>
> DEFENSE COUNSEL: Objection.
>
> THE COURT: Go ahead, Mr. [prosecuting attorney].
>
> STATE'S ATTORNEY—an accident is not a defense to felony murder and I can't tell you that enough. Even if this was an accidental shooting it's not a defense to felony murder.

In *Wilhelm v. State*, 272 Md. 404, 411–12, 326 A.2d 707 (1974), the Court defined the essential nature of an opening statement thusly:

> The primary purpose or office of an opening statement in a criminal prosecution is to apprise with reasonable succinctness the trier of facts of the questions involved and what the State or the defense expects to prove so as to prepare the trier of facts for the evidence to be adduced. While the prosecutor should be allowed a reasonable latitude in his opening statement he should be confined to statements based on facts that can be proved and his opening statement should not include reference to facts which are plainly inadmissible and which he cannot or will not be permitted to prove, or which he in good faith does not expect to prove. An opening statement by counsel is not evidence and generally has no binding force or effect.

In *Newman v. State*, 65 Md.App. 85, 499 A.2d 492 (1985), *cert. denied*, 305 Md. 419, 504 A.2d 1152 (1986), and more recently in *White v. State*, 66 Md.App. 100, 502 A.2d 1084

(1986), this Court determined that counsel was not permitted to explain the law during closing argument, even where the proposed comments were consistent with the trial court's binding instructions.

■ Instructing a jury on the undisputed law of the crime is improper whether it occurs prior to the introduction of any evidence or subsequent to the trial court's binding instructions. Furthermore, the inclusion of such comments goes well beyond the spirit of the opening statement's essential nature as set forth in *Wilhelm, supra,* wherein the Court stated:

> To secure a reversal based on an opening statement the accused is usually required to establish bad faith on the part of the prosecutor in the statement of what the prosecutor expects to prove or establish substantial prejudice resulting therefrom. (Citations omitted.)

272 Md. at 412, 326 A.2d 707.

■ Appellant has made no allegation of bad faith on the part of the prosecutor and therefore our discussion is confined to whether substantial prejudice resulted. In *Couser v. State,* 36 Md.App. 485, 501, 374 A.2d 399 (1977), *cert. denied,* 439 U.S. 852, 99 S.Ct. 158, 58 L.Ed.2d 156 (1978), this Court stated:

> It is fundamental to a fair trial that the prosecutor make no remarks calculated to unfairly prejudice the jury against the defendant. (Citations omitted.) The rule is, however, that unless it appears that the jury was actually misled or likely to have been misled or influenced to the prejudice of the accused by the remarks of the State's Attorney, reversal of the conviction on this ground will not be justified. (Citations omitted.)

We pointed out in *Leak v. State,* 84 Md.App. 353, 358, 579 A.2d 788 (1990), that "[e]ven if the prosecutor's statement during opening argument was, in fact, improper, the record must compellingly demonstrate sufficient prejudice to warrant granting [a mistrial]."

The fact is that the jury was not misled as to the law of the case. Although anticipation of the court's instruction on the law may have been improper, the opening statement did give the jury advance notice that the defense would, in all probability, maintain that the shooting was an accident. That portion of the prosecutor's comment was a proper subject matter for inclusion in an opening statement.

To the extent that the court erred in allowing the prosecutor to anticipate its eventual instruction to the jury on the law of the case, that error could not possibly have prejudiced appellant and, therefore, was harmless beyond any reasonable doubt. *See Wood v. State,* 192 Md. 643, 651–52, 65 A.2d 316 (1949).

## VII.

Lastly, appellant contends that the trial court erred in dismissing his motion for reverse waiver. According to appellant, art. 27, § 594A(b)(3), unconstitutionally discriminates against different classes of juveniles on the basis of age in violation of the due process and equal protection clauses of the 14th Amendment.[7]

---

7. Article 27, § 594A reads, in pertinent part, as follows:
594A. Transfer of certain juvenile causes.
(a) Transfer to juvenile court.—In any case, except as provided in subsection (b), involving a child who has reached 14 years of age but has not reached 18 years of age at the time of any alleged offense excluded under the provisions of 3–804(e)(1), (4), or (5) of the Courts and Judicial Proceedings Article, the court exercising jurisdiction may transfer the case to the juvenile court if a waiver is believed to be in the interests of the child or society.
(b) Certain causes not transferable.—The court may not transfer a case to the juvenile court under subsection (a) if:

. . . . .

(3) The alleged offense is murder in the first degree and the accused child is 16 or 17 at the time the alleged offense was committed.
Section 3–804 of the Courts and Judicial Proceedings Article reads, in pertinent part, as follows:
(e) The [juvenile] court does not have jurisdiction over:
(1) A child 14 years old or older alleged to have done an act which, if committed by an adult, would be a crime punishable by death or life imprisonment, as well as all other charges against the child

Appellant asserts that juveniles aged 14 and 15 are subject to possible "reverse waiver," [8] under § 3–804(e)(1) of the Courts & Judicial Proceedings Article of the Maryland Code, but that juveniles aged 16 or 17 are deprived of this procedure by art. 27, § 594A(b)(3). According to appellant, "there is no rational basis for the different treatment accorded 14 or 15–year–old juveniles versus 16 or 17–year–old juveniles."

 We note at the outset that "there is no constitutional right to be treated as a juvenile." In *In re Samuel M.,* 293 Md. 83, 95, 441 A.2d 1072 (1982), quoting *Woodard v. Wainwright,* 556 F.2d 781, 785, *rehearing denied,* 560 F.2d 1023 (5th Cir.1977), *cert. denied,* 434 U.S. 1088, 98 S.Ct. 1285, 55 L.Ed.2d 794 (1978), the Court of Appeals stated:

> Treatment as a juvenile is not an inherent right but one granted by the state legislature [;] therefore the legislature may restrict or qualify that right as it sees fit, as long as no arbitrary or discriminatory classification is involved.

The issue in *In re Samuel M., supra,* was whether the statute permitting waiver of juvenile jurisdiction was uncon-

---

arising out of the same incident, unless an order removing the proceeding to the court has been filed under Article 27, § 594A;

(4) A child 16 years old or older alleged to have committed the crime of robbery with a dangerous or deadly weapon or attempted robbery with a dangerous or deadly weapon, as well as all other charges against the child arising out of the same incident, unless an order removing the proceeding to the court has been filed under Article 27, 594A; or

(5) A child 16 years old or older alleged to have committed a crime inviolation of Article 27, 36B of the code as well as all other charges against the child arising out of the same incident, unless an order removing the proceeding to the court has been filed under Article 27, 594A.

**8.** In a "reverse waiver," the exclusive jurisdiction is vested in the circuit court ... and the juvenile seeks to have the circuit court relinquish its jurisdiction and transfer the case to the juvenile court for hearing and disposition. *King v. State,* 36 Md.App. 124, 127, 373 A.2d 292, *cert. denied,* 281 Md. 740 (1977).

stitutional on the grounds of a denial of due process. According to the Court:

> [G]iven the presumption of validity which attaches to legislative enactments, the absence of a constitutional right to treatment as a juvenile, the overriding purpose of the waiver hearing as a determinant of jurisdiction over the juvenile, and the fact that the juvenile is not impermissibly required to prove his innocence of the offenses charged prior to a later trial accompanied by the full panoply of constitutional safeguards, Maryland's legislative scheme of waiver is not violative of any of the accused's due process rights.

*Id.* at 96, 441 A.2d 1072.

The State relies on *King v. State,* 36 Md.App. 124, 127, 373 A.2d 292 (1977), *cert. denied,* 281 Md. 740 (1977), for the proposition that "the legal principles governing reverse waiver are the same as those which determine the trial court's action on a request for waiver." The holding in *King,* however, specifically applied to the situation in which the circuit court must decide whether to relinquish its jurisdiction and transfer the case to the juvenile court.

It is incorrect to use *King,* in combination with *In re Samuel M.,* as the State attempts to do, for the proposition that if the legal principles governing reverse waiver are the same as those governing waiver, and the Court of Appeals has determined that the legislative scheme of waiver is not violative of any of the accused's due process rights, then it must follow that the legislative scheme of reverse waiver is likewise not violative of the accused's due process rights.

In the case *sub judice* we are not concerned with a discretionary determination to be made by the trial court. On the contrary, § 594A(b)(3) specifically states that the court *may not transfer* a case wherein the alleged offense is first degree murder and the child is 16 or 17 years old at the time it was committed. (Emphasis supplied.)

We are convinced, however, that appellant's due process rights were not infringed in the instant case. The fact

remains that there is no constitutional right to be treated as a juvenile and, furthermore, appellant will be afforded the full panoply of constitutional safeguards in the ensuing trial.

 With respect to appellant's equal protection challenge, the Court of Appeals determined in *Matter of Trader*, 272 Md. 364, 399, 325 A.2d 398 (1974):

[I]n evaluating challenges under the equal protection clause, we do not sit as a "super legislature or a censor." (Citations omitted.) "To be able to find fault with a law is not to demonstrate its invalidity. It may seem unjust and oppressive, yet be free from judicial interference. The problems of government are practical ones and may justify, if they do not require, rough accommodations,...." (Citations omitted.)

Appellant's reliance on *Greene v. State*, 11 Md.App. 106, 273 A.2d 830 (1971), is misplaced. In *Greene*, this Court determined that a statute treating 16 and 17–year–old children in Baltimore City differently from all other children of the same age throughout the state was invalid. This was clearly a determination based on the invalidity of territorial distinctions among the counties of the state, and not age differences among its children.

In *In re Devon*, 85 Md.App. 674, 680, 584 A.2d 1287 (1991), Judge Moylan, writing on behalf of this Court, stated that:

After several centuries of pondering the criminal capacity of children and experimenting with various cut-off ages, the Common Law settled upon its current resolution of the problem by late Tudor and early Stuart times.[9]

"Cut-off" ages have always been, and will continue to be, a necessary factor in making a determination of whether a person is capable of assuming certain responsibilities. The right to vote, the right to drive, the right to purchase

---

9. For an in-depth discussion of the infancy defense and the juvenile justice system see *In re Devon,* supra.

alcohol all have in common a certain "cut-off" age where a determination has been made that the quality of mind of one individual—in the case at bar, a 16 or 17-year-old charged with first degree murder—is distinguishable from another, *e.g.*, a 14 or 15-year-old charged with the same offense.

As the Court stated in *Matter of Trader, supra,* 272 Md. at 401–02, 325 A.2d 398, "[i]n the absence of the requisite showing of unconstitutionality by the party attacking the legislative classification, it cannot be said that it does not rest upon *any* reasonable basis." (Emphasis in original.)

Accordingly, we hold that the difference in treatment is not, on its face, so irrational and invidiously discriminatory as to constitute a denial of either the equal protection or due process clauses.

JUDGMENTS AFFIRMED.

COSTS TO BE PAID BY APPELLANT.